

**SIGNED this 11 day of May, 2006.**

_____
**Marcia Phillips Parsons**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE

| In re | JAY DEWAYNE HOTTLE | No. 05-53488 | Chapter 7 |
|---|---|---|---|
| In re | JERRY A. SKELTON | No. 05-53495 | Chapter 7 |
| In re | DEBORAH ELAINE CATRON | No. 05-54341 | Chapter 7 |
| In re | CARL DAVID EIDSON | No. 05-54379 | Chapter 7 |
| In re | JENNIFER MICHELLE BORTON | No. 05-54749 | Chapter 7 |
| In re | JOE EDWARD GOODSON | No. 05-54752 | Chapter 7 |
| In re | ERIC WAYNE PEARSON | No. 05-54759 | Chapter 7 |
| In re | DONALD R. MITCHELL and ROBIN S. MITCHELL, | No. 05-54770 | Chapter 7 |
| In re | BILLY RAY GIBSON and SANDRA KAYE GIBSON | No. 05-54913 | Chapter 7 |
| In re | CLIFFORD JASON KING | No. 05-55220 | Chapter 7 |
| In re | CONNY STIPES | No. 05-55318 | Chapter 7 |
| In re | AMANDA MARIE PREECE | No. 05-55667 | Chapter 7 |
| In re | ELLA MAE HICKMAN | No. 05-55672 | Chapter 7 |

# MEMORANDUM

APPEARANCES:

> PATRICIA C. FOSTER, ESQ.
> 800 Market Street, Suite 114
> Howard H. Baker, Jr. United States Courthouse
> Knoxville, Tennessee 37902
> *Attorney for Richard F. Clippard, United States Trustee, Region 8*
>
> T. WOOD SMITH, ESQ.
> 416 W. Main Street
> Greeneville, Tennessee 37743
> *Attorney for Debtors*
>
> JOHN S. ANDERSON, ESQ.
> 101 West Broadway, Suite 2
> Rogersville, Tennessee 37857
> *Pro se*

**MARCIA PHILLIPS PARSONS**
**UNITED STATES BANKRUPTCY JUDGE**

On March 18, 2005, after notice and a hearing, this court entered an order granting the chapter 13 trustee's motion for sanctions against attorney John S. Anderson by prohibiting Mr. Anderson from filing any new bankruptcy cases on behalf of debtors for a period of one year. The order also provided that in order to commence filing new cases after the expiration of the one-year period, Mr. Anderson must file a statement with the court setting forth all of the steps that he has taken to remedy the problems which led to entry of the suspension order. In the instant cases, the United States Trustee asserts that Mr. Anderson acted in derogation of the March 18, 2005 order by continuing to accept new bankruptcy clients. The United States Trustee requests, *inter alia*, that Mr. Anderson be required to disgorge all fees received by him in these cases pursuant to 11 U.S.C. § 329(b). A consolidated hearing was held in these cases on January 10, 2006. For the reasons that follow, the disgorgement request will be granted. These are core proceedings. *See* 28 U.S.C. § 157(b)(2)(A).

I.

On November 23, 2005, the United States Trustee ("UST") filed a motion in the case of Amanda Preece requesting that Mr. Anderson be required to disgorge fees paid to him by Ms. Preece.  According to the motion, Ms. Preece retained Mr. Anderson in late April or May 2005 for the purpose of filing a bankruptcy case on her behalf and by late September 2005, paid Mr. Anderson sums totaling $759 for the bankruptcy filing fee and his attorney fees.  The motion recites that Mr. Anderson failed to inform Ms. Preece that he was unable to commence a bankruptcy case on her behalf due to his suspension, that she was subsequently advised by Mr. Anderson that another attorney would file a case for her, that she was thereafter contacted by attorney T. Wood Smith who filed a petition on her behalf, and that documents filed in her case indicate that Mr. Anderson paid Mr. Smith $250 of the monies he received from Ms. Preece.  The UST requests in the motion that Mr. Anderson be required to disgorge the funds retained by him because the fees exceed the reasonable value of his services pursuant to 11 U.S.C. § 329(b) due to his suspension.

On November 25, 2005, the UST filed a second motion for the disgorgement of attorney fees received by Mr. Anderson.  This motion was not filed in any particular pending case, but as a miscellaneous filing with regard to Mr. Anderson generally as an attorney practicing before this court.[1]  The UST states in the motion that notwithstanding Mr. Anderson's suspension, he has continued to hold himself out as a bankruptcy attorney and has received payment from numerous clients for the purpose of filing bankruptcy cases for them.  The motion recites that it was the practice of Mr. Anderson to split the fee received from his clients with Mr. Smith who would then file the bankruptcy case on behalf of the individual.  The UST seeks an order requiring Mr. Anderson to disclose the names of all such individuals and disgorge to them or to the trustee the fees retained by him because the fees exceed the value of his services pursuant to 11 U.S.C. § 329(b) in light of his suspension from practice.

This motion also states that Sue Ann Eidson retained and paid Mr. Anderson $709 in 2001

---

[1] For the purpose of having a complete electronic record of this matter, the court directs  the clerk to docket the November 25, 2005 paper motion captioned *In re John S. Anderson* in the *Preece* case.

3

and Murry Novella Eidson retained and paid Mr. Anderson $500 in December 2004 for the purpose of commencing chapter 7 bankruptcy cases on their behaves, and that Mr. Anderson recently advised them that their cases had been filed when in fact no cases had been filed. The UST requests on behalf of these two individuals that Mr. Anderson be required to return the monies they paid him.

On December 6, 2005, the UST filed virtually identical motions for disgorgement in the pending bankruptcy cases of Jay Dewayne Hottle, Jerry A. Skelton, Deborah Elaine Catron, Carl David Eidson, Jennifer Michelle Borton, Joe Edward Goodson, Eric Wayne Pearson, Donald R. and Robin S. Mitchell, Billy Ray and Sandra Kaye Gibson, Clifford Jason King, Conny Stipes, and Ella Mae Hickman. In each motion, the UST states that the debtor therein recently filed a petition for bankruptcy relief represented by attorney T. Wood Smith, that the documents in each case indicate that the debtor paid Mr. Anderson either $500 or $550 for bankruptcy services at a specified date before the bankruptcy filing, that Mr. Anderson paid to Mr. Smith $250 of these fees, and that Mr. Anderson was under suspension at the time of his retention. The UST requests in the motions that Mr. Anderson be required to disgorge to each debtor the fees retained by him, again based on the assertion that the fees exceed the value of his services.

On December 19, 2005, Mr. Anderson filed in the *Preece* case an unverified response to the UST's motion to disgorge, in which he addresses not only the *Preece* motion but also the UST's motion that was filed as to him generally. In his response, Mr. Anderson states that he appeared on Ms. Preece's behalf in a general sessions court action against her and that his minimum fee for such appearances is $250. He also indicates that he appealed the decision of the general sessions court to the circuit court on Ms. Preece's behalf, paying the $47.50 cost of appeal out of the money she had paid him. As to her bankruptcy case, Mr. Anderson states that he met with Ms. Preece on several occasions to advise her about her debts, that he "updated all her information and organized it," and then sent her schedules to Mr. Smith. With regard to the UST's allegations concerning Sue Ann Eidson and Novella Eidson, Mr. Anderson states that he has refunded to them their fees by money order. Lastly, he states that he will provide to the UST the names of clients referred by him to other attorneys but objects to divulging the names of clients who have paid him fees for whom bankruptcy cases have not been filed, asserting that this court is without jurisdiction over these attorney/client relationships and that disclosing the names would be a breach of attorney/client

4

confidentiality.

On January 9, 2006, the day before the scheduled January 10 consolidated hearing on all of the disgorgement motions,[2] Mr. Anderson filed an unverified response to the motion to disgorge attorney fees and a memorandum in support thereof in the *Hottle*, *Skelton*, *Catron*, *Eidson*, *Goodson*, *Mitchell*, *Gibson*, *King*, *Stipes*, and *Hickman* cases.  Mr. Anderson states in the response that the UST's motion in each case should be denied because he "gave advice to the debtors, met with them or [sic] more than 2 occasions, explained bankruptcy procedures and advised then [sic] how to proceed.  I then helped them compile their schedules and went over them with them.  I expended several hours on each case."  Mr. Anderson concludes that "$250.00 for the numerous hours of work and advice is more than reasonable," and observes that none of the debtors or the trustees in the cases have requested disgorgement of his fees.  Lastly, Mr. Anderson states,  "I waive my right to be present."

Consistent with his waiver, Mr. Anderson did not appear at the January 10, 2006 hearing. Debtors Amanda Preece, Conny Stipes, Jennifer Borton, and Ella Mae Hickman each testified, and Mr. Smith, the attorney representing these debtors in their bankruptcy cases, was present and responded to questions from the court.   Also testifying was Shirley Kakas, an individual who retained Mr. Anderson for the purpose of filing a bankruptcy case on her behalf but which was never filed.  The attorney for the UST announced at the commencement of the hearing that Mr. Anderson had refunded the fees paid to him by Sue Ann Eidson and Novella Eidson.

## II.

Debtor Amanda Preece, a resident of Rogersville, Tennessee, testified that she first contacted Mr. Anderson in the latter part of April or the first part of May 2005 for the purpose of filing bankruptcy and that she paid him $759 in installments over a period of time with the last payment

---

[2] The *Preece* disgorgement motion was initially set for hearing on December 20, 2005, but continued to January 10, 2006.  The general disgorgement motion captioned *In re John S. Anderson* was initially set for hearing on December 21, 2005, but continued until January 10, 2006.  The UST's motions in the *Hottle*, *Skelton*, *Catron*, *Eidson*, *Borton*, *Goodson*, *Pearson*, *Mitchell*, *Gibson*, *King*, *Stipes*, and *Hickman* cases were all originally noticed for January 10, 2006.

the first of September.  From conversations with Mr. Anderson, Ms. Preece believed that her case would be filed by October 1, 2005, which she thought was the deadline for filing due to the upcoming changes in the bankruptcy law, and testified that she had difficulty in getting in touch with Mr. Anderson to determine if her case had indeed been filed. Ms. Preece explained:

> "I tried and tried and tried to contact him, after I had finished paying him off, and I couldn't get a return phone call. And then finally I went to the office, and he wasn't in then, either.  And I went home and I called again and he finally got on the phone with me.  And he said that it wasn't – the deadline wasn't October 1st, it was October 17th, and that he still had time to get it done, and that he would be doing it from the next week.  And then just several phone calls were made.  He never returned my call. It was a mess."

Ms. Preece testified that the week before October 17, she learned from another attorney that Mr. Anderson was not permitted to file new bankruptcy cases, and that after contacting Mr. Anderson to ask about this, Mr. Anderson's response was that "it was no big deal" and that one of his colleagues would be contacting her and handling her bankruptcy case.  Ms. Preece stated that Mr. Anderson's office had prepared her bankruptcy paperwork from a credit report that she had given him and from some collection letters she had received from hospitals.  She said she went to Mr. Anderson's office around October 12, 2005, to sign the bankruptcy documents and upon review saw that the information was not correct because it did not have several of her creditors from the credit report.  After Mr. Anderson's secretary indicated that she did not have the report,  Mr. Anderson  located the report.  Notwithstanding the deficiencies in her bankruptcy documents, Ms. Preece was advised to go ahead and sign them and that the documents would be corrected later.  On Sunday, October 16, 2005, Mr. Smith contacted Ms. Preece by telephone and advised her that he would be filing her bankruptcy for her so she assumed that he was one of Mr. Anderson's colleagues.

Ms. Preece was questioned at the hearing about Mr. Anderson's assertion in his filed response that he had appeared in general sessions court and filed an appeal on her behalf.  She testified that she had retained Mr. Anderson and paid him monies for the sole purpose of filing bankruptcy.  Ms. Preece indicated that although she had talked to Mr. Anderson about the general sessions hearing before it took place, he had advised her that it was not necessary for her to attend and she never had any discussions with him thereafter about the hearing.  Ms. Preece testified that

she was never informed whether Mr. Anderson went to the hearing, the outcome of the hearing, or anything about an appeal.

An examination of the record in Ms. Preece's bankruptcy case reveals that her chapter 7 case was commenced on October 16, 2005. The petition and all of the schedules are signed by Mr. Smith as the attorney for the debtor with a date of October 15, 2005, and it appears that Mr. Smith's signature is over another signature which has been whited out. And, notwithstanding Ms. Preece's testimony that she signed the documents at Mr. Anderson's office a few days before her phone call with Mr. Smith, all of her signatures are dated October 15, 2005, the same as Mr. Smith's. Ms. Preece's statement of financial affairs indicates that she paid Mr. Anderson $550 in May 2005 for bankruptcy services. The disclosure of compensation statement filed by Mr. Smith recites that he agreed to accept $250 for legal services in this case and that he had received this sum from Mr. Anderson. No disclosure statement has been filed in the case by Mr. Anderson.

Debtor Connie Stipes, also a resident of Rogersville, Tennessee, testified that she first contacted Mr. Anderson for the purpose of filing bankruptcy on May 8, 2005. He informed her that he would file a bankruptcy case for her if she paid him the $209 filing fee and that he would work with her on payment of his attorney fee. She paid him the filing fee on that date and stated that it was her understanding that her case would be filed shortly thereafter but it was not. Ms. Stipes stated, "The few times I could get a-hold of him, he had all my bills. And he kept saying that it was being done, it was being done. But he was very hard to get a-hold of." Ms. Stipes testified that on September 28, 2005, after she completed paying Mr. Anderson $500 in attorney fees, he told her that he would file her case but he apparently did not do so because she kept receiving collection letters and telephone calls from creditors at home and at work. About a week after receiving payment from her and after, in her words, she "kept bugging him," Ms. Stipes was told to come to Mr. Anderson's office to sign her bankruptcy paperwork. Upon review of the documents, she saw that they were incomplete, but Mr. Anderson told her to go ahead and sign and he would have his secretary finish them later. Ms. Stipes testified that subsequently Mr. Smith telephoned her and told her that he would be filing her bankruptcy case for her. She said that she was never told that Mr. Anderson would not be able to file on her behalf and understood that Mr. Smith's participation had something to do with electronic filing.

7

A review of Ms. Stipes' bankruptcy case indicates that she filed for relief under chapter 7 on October 14, 2005, with the petition signed by Mr. Smith as attorney for the debtor. Again, it appears that his name has been typed in over another signature previously whited out. As in the case of Ms. Preece, Ms. Stipes' statement of financial affairs indicates that she paid Mr. Anderson $500 in May 2005, and Mr. Smith's disclosure of compensation statement provides that he was paid $250 by Mr. Anderson. Mr. Anderson did not file a disclosure of compensation statement.

Debtor Jennifer Michelle Borton, a resident of Rogersville, Tennessee, testified that she first met with Mr. Anderson around the 28th of November 2004 and advised him that her divorce would be final on December 1, 2004, and that she wanted to file bankruptcy as soon as possible thereafter. According to Ms. Borton, Mr. Anderson accepted employment and told her that his fee would be $709. She paid him $610 of this amount on November 29, 2004, gave him all of her bills, and he filled out her bankruptcy paperwork by hand. On December 2, 2004, Ms. Borton paid him the balance of her fee and anticipated that her case would be filed shortly thereafter. Nonetheless, her case was not filed until October 13, 2005, by Mr. Smith.

Ms. Borton testified that after paying Mr. Anderson, she began calling him twice a week in an attempt to determine when her bankruptcy case would be filed, and that, "If I could have camped in his office I probably would have." In January 2005, Mr. Anderson told her that he was going to wait until after her tax return was prepared "so the court couldn't seize [her] tax money." Ms. Borton testified that in the middle of February she began calling Mr. Anderson again. He then told her that her case had been filed, that bankruptcy trustees meet the first and fourth Thursdays of each month, and that she would be going to court on her bankruptcy case the fourth Thursday in March. Ms. Borton testified that she took the day off work to attend but when she never received notice of a court date (presumably a § 341 meeting date), she telephoned Mr. Anderson who told her "it was going to be the first Thursday in April. And then it was going to be the fourth Thursday in April. And then again in May. And it never happened. And I just proceeded to call him and call him and call him." In all, Ms. Borton missed four days of work because of misstatements from Mr. Anderson as to her bankruptcy meeting date.

In February and May 2005, Ms. Borton's checking account was garnished by one of her

creditors, leaving her unable to pay her rent.  When she complained to Mr. Anderson on the first occasion, he said there was nothing he could do since he had been waiting until after she filed her tax return to commence her bankruptcy case.  When the garnishment occurred again in May, "I contacted [Mr. Anderson] and contacted him and contacted him." After she eventually got in touch with Mr. Anderson, he advised her that he had attempted to obtain a refund from the creditor but was getting the runaround.  Ms. Borton testified that after three weeks of persistently complaining to Mr. Anderson that she needed the money for rent, Mr. Anderson paid her $250.  Ms. Borton stated that she subsequently received a call from Mr. Smith's office that he would be filing her case.  She stated that she was "completely blown away when the worker called [her]," that Mr. Anderson had never informed her that he would not be filing her case, and that no reason for the substitution was provided to her.  She then met with Mr. Smith, who went over schedules with her, and she signed them in his office.

Ms. Borton's statement of financial affairs confirms that she paid Mr. Anderson an attorney fee of $500 in December 2004.  As with respect to the other cases, Mr. Smith's disclosure statement reflects payment of $250 from Mr. Anderson.  No disclosure statement has been filed by Mr. Anderson.

Debtor Ella Mae Hickman, a resident of Rogersville, Tennessee, testified that she first met with Mr. Anderson in 2003 for the purpose of filing a bankruptcy case on her behalf due to medical bills and that at this first meeting she paid Mr. Anderson $750 and gave him the information regarding her medical bills.  Ms. Hickman stated that a short time later she went back to his office to sign her bankruptcy paperwork and that thereafter she attempted numerous times to talk with Mr. Anderson to determine the status of her case.  According to Ms. Hickman, she telephoned Mr. Anderson but he would not return her calls; on occasion she would go to his office and wait to talk to him but was never able to, and she even left him notes asking what was going on and what had happened to her money. Ms. Hickman testified that she had a nervous breakdown because of the stress caused by her poor health, her long work hours, and the fact that creditors continued to harass her at work and at home, and that her condition subsequently resulted in her having to quit her job in 2004.

Ms. Hickman testified that in May 2005 Mr. Anderson finally advised her that she would be going to bankruptcy court in connection with her case, but that he would have to postpone the matter because his mother was sick and in the hospital. Ms. Hickman stated that she later learned that this was incorrect because Mr. Anderson's mother had been deceased since 2004.

Ms. Hickman testified that subsequently in October 2005 she went to Mr. Anderson's office and refused to leave until he spoke with her. At that time he told her that another attorney would be contacting her to help with her case because he was booked and that she would be going to court on October 27, which she subsequently learned was incorrect because her case had not yet been filed. Thereafter, Mr. Smith telephoned her and told her that he was taking over her case from Mr. Anderson. He asked her some questions in the phone conversation and requested that she send him her most recent bills. On October 16, 2005, Mr. Smith filed the present case on behalf of Ms. Hickman.

According to Ms. Hickman, the only paperwork she ever signed in connection with her case were two papers signed by her in Mr. Anderson's office in 2003. Ms. Hickman testified that the schedules filed in her case indicates that she works at Food City, but she testified that she has never worked there. A review of the record in this case indicates that Ms. Hickman's signature on her petition, her schedules and statement of financial affairs all have a date of October 16, 2005, the date her case was filed. The statement of financial affairs indicates that Ms. Hickman paid $500 to Mr. Anderson within one year prior to her bankruptcy filing, but the date of payment is not listed. Mr. Smith's disclosure statement provides that he agreed to accept and has received $250 from Mr. Anderson for his services in connection with the case. Mr. Anderson has not filed a disclosure statement in Ms. Hickman's case.

Shirley Kakas, who is 75 years old, testified in the matter involving Mr. Anderson generally. She stated that she is not a debtor in a bankruptcy case but that for a long time she believed that she had filed bankruptcy. Ms. Kakas testified that in June 2005 she contacted Mr. Anderson for the purpose of filing a bankruptcy case on her behalf. Mr. Anderson informed her at the time that it would not be necessary for her to file bankruptcy and that he could help her by other means which would only cost $200, so she paid him $200. According to Ms. Kakas, Mr. Anderson subsequently

10

advised her that bankruptcy would be necessary after all and that there would be an additional cost of $509 which she paid on July 14, 2005. Upon payment of these additional monies, Mr. Anderson informed Ms. Kakas that she would be going to court on her bankruptcy case the end of September so she assumed that her case would be filed shortly thereafter. When September came and went, Ms. Kakas attempted to get in touch with Mr. Anderson but was never able to because he was always in court every time she tried. She testified that she only learned two days before the present hearing that Mr. Anderson had never filed a bankruptcy case on her behalf.

The UST submitted no evidence with respect to the other cases in which disgorgement by Mr. Anderson is sought although the attorney for the UST requested that the court examine the record in each case. She observed that each case reflects payment of either $500 or $550 in attorney fees by the debtor to Mr. Anderson and subsequent payment of $250 by Mr. Anderson to Mr. Smith, who then filed a bankruptcy case on behalf of each debtor.[3]

In an oral statement to the court, Mr. Smith explained that Mr. Anderson contacted him in late spring 2005 and advised him that he had been banned from any future filings and that there were a number of cases for which he had prepared the paperwork and needed to file. Mr. Anderson asked Mr. Smith if he would file the cases on behalf of these individuals for $250 per case plus the filing fee. Mr. Smith stated that Mr. Anderson told him that he would advise the clients that he would not be able to file their bankruptcy cases for them and that he would be referring them to another attorney. Mr. Smith said that Mr. Anderson told him in this initial conversation that he did not have the money at that time but would be in touch at a later date.

According to Mr. Smith, in August or September 2005, Mr. Anderson began sending him signed bankruptcy schedules and statements for several individuals. Mr. Smith stated that upon

---

[3] The *Hottle* and *Skeleton* cases were filed on September 15, 2005; the cases of *Catron*, *Eidson*, *Goodson*, *Pearson*, *Mitchell*, *Gibson*, and *King* were filed in October 2005, all within six days preceding October 17, 2005. The majority of these cases reflect payment by the debtor to Mr. Anderson considerably before the filing date. In the *Gibson* and *Eidson* cases, Mr. Anderson received payment for filing their cases in early 2002, more than three years before the bankruptcy cases were finally filed. In the *Hottle*, *Goodson*, and *Pearson* cases, the debtors paid Mr. Anderson in 2004. Both the *King* and *Skeleton* cases evidence payment of fees to Mr. Anderson in January 2005. Only in *Mitchell* was the case filed within six months of Mr. Anderson being paid to do so.

receipt of the documents, he contacted the individual and had him or her meet with him, although as October 17 approached, he interviewed the clients over the telephone because he did not have time to actually meet with the clients.  Mr. Smith explained that during the week before the Bankruptcy Reform Act of 2005 went into effect, he filed about 127 cases, all without the help of a full-time, regular secretary.  Mr. Smith stated that in the telephone interviews he covered the information that he normally covers in an initial interview, such as the right to file chapter 13, and also confirmed that the information in the schedules provided to him by Mr. Anderson was correct. In the event information in the schedules was incorrect, Mr. Smith advised the client that he would be making the changes in the documents already signed.

Mr. Smith stated that at the time Mr. Anderson forwarded the various schedules and statements to him, he also sent along checks for the filing fees and attorney fees.  The checks were not written on Mr. Anderson's trust account and all of the checks initially bounced.  Mr. Smith indicated that he was still owed $800 for checks that have not yet been replaced.

III.

As previously noted, the statutory basis for the UST's disgorgement motion is 11 U.S.C. § 329(b).  Section 329 of the Bankruptcy Code provides in its entirety the following:

> (a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.
> (b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive to—
>
>> (1) the estate, if the property transferred—
>>
>>> (A) would have been property of the estate; or
>>>
>>> (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
>>
>> (2) the entity that made such payment.

12

11 U.S.C § 329.[4] "The authority of the Bankruptcy Court to review compensation is a traditional power of the court and is essential to avoid overreaching by a debtor's attorney." *In re Ray*, 314 B.R. 643, 652-53 (Bankr. M.D. Tenn. 2004).

In the present case, the UST asserts that the compensation paid by the debtors to Mr. Anderson *ipso facto* exceeded the reasonable value of his services under § 329(b) because of Mr. Anderson's suspension. As stated by the UST, "Mr. Anderson accepted fees from the debtor with full knowledge of the fact that he could not provide the services he was being paid to perform such as filing the case, attending the creditors meeting, negotiating any reaffirmation agreements or redemptions on behalf of the debtor with creditors, or making necessary appearances before this Court on the debtor's behalf."

Although bankruptcy courts have generally relied on their statutory authority under § 105 of the Bankruptcy Code or on the court's inherent authority in sanctioning attorneys,[5] it has been observed that "Bankruptcy Code § 329 permits unethical conduct to serve as a factor considered in analyzing the reasonableness of legal fees paid by a debtor." *In re Soulisak*, 227 B.R. 77, 82 (Bankr. E.D. Va. 1998); *see also In re Sadorus*, 2005 WL 3429467, *4 (Bankr. C.D. Ill. 2005) (An attorney's

---

[4] Subsection (b) of § 329 is implemented by Federal Rule of Bankruptcy Procedure 2017(a) which provides that:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order of relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

[5] *See, e.g., Brown v. Goode, Peterson & Hemme (In re Brown)*, 270 B.R. 43 (Bankr. D.S.C. 2001) (citing § 105 and its inherent authority to regulate those who practice before it, bankruptcy court ordered attorney to disgorge all fees paid to him where attorney engaged in unauthorized practice of law); *In re Desilets*, 247 B.R. 660, 674 (Bankr. W.D. Mich. 2000), *rev'd on other grounds*, 291 F. 3d 925 (6th Cir. 2002) ("any fee collected by [attorney] for legal advice in those two bankruptcy cases would be without value, because [attorney] was not authorized to give any advice"). *See also In re Downs*, 103 F.3d 472, 477 (6th Cir. 1996) (bankruptcy courts are vested with the inherent power to sanction attorneys for improper conduct, including breaches of fiduciary obligations).

unethical conduct is a factor to be considered in determining the reasonableness of a legal fee paid by a debtor.); *In re Damon*, 40 B.R. 367, 376 (Bankr. S.D.N.Y. 1984) ("Forfeiture [of attorney fees] is . . . mandated [under § 329(b)] if an attorney violates ethical standards, his fiduciary duties to his client or duty as an officer of the court.").

From his responses to the UST's disgorgement motions, Mr. Anderson appears to be making the argument that this court's suspension order did not prohibit him from continuing to advise prospective debtors regarding bankruptcy and that he was free to represent them in connection with their bankruptcy cases in all respects other than actually filing the cases and appearing in court. This interpretation is contrary not only to the letter but also the spirit of the court's suspension order. An attorney's filing of a bankruptcy case on behalf of an individual consists of much more than merely filing the required documents and appearing with the individual at the § 341 meeting of creditors and any court hearing. At the core of the attorney's representation of a potential bankruptcy debtor is the advice given by the attorney to the client regarding bankruptcy, including the differences between the bankruptcy chapters and a determination of the chapter most appropriate for the client's individual needs; the costs, benefits, and consequences of filing bankruptcy; the valuation and retention of assets; the declaration of exemptions; the effect of discharge; and the advisability of reaffirmations. The evidence presented by the chapter 13 trustee at the March 11, 2005 hearing which led to the March 18, 2005 suspension order established that Mr. Anderson was representing his bankruptcy clients in a negligent and unprofessional manner not only in connection with his appearances before this court but also in his prefiling preparation of the cases, with his negligence often resulting in the dismissal of his clients' cases. This court is confident that at the conclusion of the hearing, both from this court's remarks in open court and from the language of the order, that Mr. Anderson clearly understood that he was not to engage in a bankruptcy practice until such time as he had petitioned this court for readmission, by establishing to the court's satisfaction that he had undertaken efforts to correct his unprofessional practice.

Furthermore, Mr. Anderson's actions with respect to the debtors herein were inconsistent with a belief on his part that the suspension merely prohibited the actual filing of the petition commencing the case. Mr. Anderson did not advise any of the debtors that he was under a suspension from filing new cases and that someone else would do the actual filing. Rather, Mr.

14

Anderson continued to hold himself out as a bankruptcy attorney and continued to accept new clients for the express and agreed purpose of filing bankruptcy cases for them, notwithstanding his suspension. And, with respect to the clients that had already retained Mr. Anderson at the time of the suspension, Mr. Anderson made no effort to advise these clients that he was no longer able to file bankruptcy cases on their behaves and that they would have to obtain the services of another attorney.

The United States Bankruptcy Court for the Eastern District of Tennessee has adopted as rules of professional conduct for attorneys practicing in this court the same rules of conduct prescribed by the Tennessee Supreme Court.[6] *See* E.D. Tenn. LBR 2090-2. Rule 1.16 states that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of the client if: (1) the representation will result in a violation of the Rules of Professional Conduct or other law. . . . " Mr. Anderson's acceptance of new bankruptcy clients and his failure to withdraw from representation of existing bankruptcy clients when his suspension went into effect was a violation of this rule, justifying the disgorgement of fees received by him from these clients.

Additionally, Mr. Anderson's conduct in this regard was a violation of Rule 8.4(c) which provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." After the suspension order went into effect, Mr. Anderson's acceptance of new bankruptcy clients and fees from these clients for the purpose of filing bankruptcy cases for them was at a minimum a misrepresentation because he knew that he was unable to provide the services for which they had contracted, the filing of a bankruptcy case.

It is clear to this court that Mr. Anderson's representation of the debtors in these cases was expressly contrary to this court's March 18, 2005 order, and was in violation of the ethical rules which govern Mr. Anderson's practice before this court. As such, this court concludes that the fees paid by the debtors to Mr. Anderson are unreasonable and excessive and that disgorgement is required by § 329(a) of the Bankruptcy Code.

---

[6] The Rules of Professional Conduct, abbreviated "Rule ___" and cited as "R.P.C. __," are set forth in Rule 8 of the Rules of the Tennessee Supreme Court.

While the only issue before this court is the fact that Mr. Anderson represented these debtors at all in light of the suspension order, this court would be remiss if it failed to take note of the manner in which Mr. Anderson represented the debtors in these cases.  Plainly, the problems that led to Mr. Anderson's suspension have continued to exist.  Rule 1.1 states, "A lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."  Rule 1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client."  Rule 1.4, which governs a lawyer's communication with a client, provides that:

> (a) A lawyer shall keep a client reasonably informed about the status of a matter and comply with reasonable requests for information within a reasonable time.
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

And, as previously noted, "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."  R.P.C. 8.4(c).

From the evidence presented at the hearing, it was clear that in each case Mr. Anderson violated these Rules of Professional Conduct by failing to provide competent representation, failing to act with reasonable diligence and promptness, failing to keep his clients informed regarding the status of their cases, and with respect to Jennifer Borton, Ella Mae Hickman and Shirley Kakas, making misstatements of fact by advising them that their bankruptcy cases had been filed when they had not.  Mr. Anderson's flawed representation was not only unethical but it also resulted in unfortunate personal and economic consequences for the debtors.  Because of Mr. Anderson's inaction (and misrepresentations), Ms. Borton continued to have her paycheck garnished and missed four days of work.  Ms. Hickman endured such stress during the three years that she waited for Mr. Anderson to file a bankruptcy case on her behalf that she suffered a nervous breakdown, causing her to have to quit her job.

Moreover, in most instances, the debtors in these cases learned from sources other than Mr. Anderson that he would not be able to file a bankruptcy case for them and they learned this information just before the new bankruptcy law went into effect, giving them little or no time to take action to evaluate their options with a new attorney of their own choosing.  In this regard, Mr. Anderson failed to comply with Rule 1.16(d) which provides:

16

Upon termination of the representation of a client, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests including:

(1) giving reasonable notice to the client so as to allow time for the employment of other counsel;

(2) promptly surrendering papers and property of the client and any work product prepared by the lawyer for the client and for which the lawyer has been compensated;

(3) promptly surrendering any other work product prepared by the lawyer for the client, provided, however, that the lawyer may retain such work product to the extent permitted by other law but only if the retention of the work product will not have a materially adverse affect on the client with respect to the subject matter of the representation;

(4) promptly refunding to the client any advance payment for expenses that have not been incurred by the lawyer; and

(5) promptly refunding any advance payment for fees that have not been earned.[7]

By taking it upon himself to refer his clients to Mr. Smith without each client's consent, Mr. Anderson also ran afoul of two other ethical rules. The first is Rule 1.6(a) which provides that "a lawyer shall not reveal information relating to the representation of a client unless the client consents after consultation," subject to certain exceptions which are inapplicable here. The second is the rule that pertains to the sharing of fees between attorneys who are not in the same firm, Rule 1.5(e):

A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written consent of the client, each lawyer assumes joint responsibility for the representation; and

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the fee is reasonable.

R.P.C. 1.5(e). There is no indication in any of the cases before the court that the debtors agreed to

---

[7] There was no indication that Mr. Anderson complied with paragraphs (2) and (3) of this Rule which require an attorney upon termination of employment to promptly surrender to the client the client's papers and the attorney's work product. Similarly, Mr. Anderson failed to comply with paragraphs (4) and (5) which require the prompt refund of advance payment for unearned fees and expenses.

17

having their confidential information, including their files, transferred to another attorney or that they were specifically advised of the fee splitting arrangement. Debtors Stipes, Borton and Hickman all testified that they learned from Mr. Smith rather than from Mr. Anderson that Mr. Smith would be filing their cases.

Another area of concern to this court is that the fact that the checks to Mr. Smith from Mr. Anderson for attorney fees were returned by the bank for insufficient funds. Rule 1.15 mandates that "a lawyer shall hold property and funds of clients . . . that are in a lawyer's possession in connection with a representation separate from the lawyer's own property and funds." At a minimum, the fees paid by debtors to Mr. Anderson should have been placed in a trust account until such time as the services were provided. Mr. Smith's statement that the checks paid to him by Mr. Anderson were not drawn on Mr. Anderson's trust account indicates that these unearned fees were not kept separate from Mr. Anderson's general funds, contrary to ethical requirements. *See* Tenn. B. Pro. Resp. Formal Ethics Opinion 92-F-128(a) ("All unearned attorney fees of any kind or nature paid by or on behalf of a client to an attorney are funds which belong in part to the client. These unearned attorney fees include retainer fees, unearned advanced fees, general retainers, special retainers, flat fees, pre-paid fees, etc. These funds must be deposited in a trust account to be withdrawn only when due, unless the right of the attorney or other payee to receive funds is disputed by the client. In the event of dispute, the disputed portion shall not be withdrawn until the dispute is resolved.").

While it would not be appropriate at this time to impose additional sanctions against Mr. Anderson because of these ethical violations since he was not placed on notice of them in the disgorgement motions, it is incumbent upon this court to refer this matter to the Tennessee Board of Professional Responsibility for further investigation and possible discipline. *See* R.P.C 8.3(a) ("A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the Disciplinary Counsel of the Board of Professional Responsibility.").

And, while it was not raised by the UST in his disgorgement motions, this court also notes

18

that Mr. Anderson failed in all of these cases to comply with the requirement set forth in 11 U.S.C. § 329(a) and Federal Rule of Bankruptcy Procedure 2016(b)[8] that he file a disclosure of compensation statement.  As quoted above, § 329(a) requires any attorney representing a debtor in a bankruptcy case or in connection with a bankruptcy case to file with the court a statement of compensation paid or agreed to be paid for services rendered or to be rendered in contemplation of or in connection with the case by the attorney.  Rule 2016 specifies that the § 329(a) compensation statement is to be filed by the attorney within 15 days after the order for relief.  In each of the cases before the court, the debtor retained Mr. Anderson for services to be rendered by him in contemplation of a bankruptcy case.  Accordingly, Mr. Anderson was obligated by § 329(a) to file a statement setting forth the compensation arrangement for his services and the source of the compensation.  The Sixth Circuit Court of Appeals has held that "the bankruptcy court should deny all compensation to an attorney who exhibits a willful disregard of his fiduciary obligations to fully disclose the nature and circumstances of his fee arrangement under § 329 and Rule 2016."  *In re Downs*, 103 F.3d at 479.  Because Mr. Anderson's failure to file the appropriate disclosure statements was not addressed at the hearing by the UST, this court is unable to determine whether Mr. Anderson's failure was "a willful disregard of his fiduciary obligations."[9]  Nonetheless, the

---

[8] Disclosure of Compensation Paid or Promised to Attorney for Debtor.
Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity.  The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required.  A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

[9] This court notes that 11 U.S.C. § 329(a) limits its scope to fee arrangements made by a debtor within the year before the bankruptcy filing and that in some of the cases at hand the debtor first retained Mr. Anderson more than one year before the bankruptcy filing.  There is no indication, however, that the debtors requested Mr. Anderson to wait more than a year to commence bankruptcy proceedings for them.  Rather, the delay in time appears to be the result of Mr. Anderson's failure to act with the reasonable promptness and diligence required by the Rules of Professional Conduct. This court would find no merit to the argument that § 329(a) is inapplicable to the cases where Mr.

court does view the failure as symptomatic of what would appear to be Mr. Anderson's wholesale disregard of his ethical and professional obligations to the debtors and this court.[10]

Lastly, this court must address the situation concerning Shirley Kakas who in June 2005 retained Mr. Anderson for bankruptcy services for her that were never performed.  As previously noted, Mr. Anderson's response to revealing the names of clients for whom he has been retained to file bankruptcy cases but for whom no case has ever been filed is that this court is without jurisdiction and that it would violate the clients' confidentiality, an ironic posture in light of Mr. Anderson's breaches in the instant cases of the confidentiality requirement.  Although Mr. Anderson did not specifically mention Ms. Kakas in his response, presumably he would maintain that this court is without jurisdiction over any fees she paid him because Ms. Kakas is not a debtor in this court.  However, Mr. Anderson's acceptance of Ms. Kakas as a client for the purpose of filing a bankruptcy case on her behalf was in direct contravention of this court's order prohibiting Mr. Anderson from filing any new bankruptcy cases.  Plainly, this court has the authority to enforce its own orders.  See 11 U.S.C. § 105(a) ("The court may take . . . any action . . . appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.); *In re Radar*, 3 F.3d 1174, 1178-79 (8th Cir. 1993) (§ 105(a) provides court power to enforce and implement its order of disqualification of attorney).

———————————————

Anderson through his lack of diligence caused the bankruptcy case to be filed more than a year after the fee agreement in contemplation of bankruptcy was reached.

[10] This disregard is also illustrated by Mr. Anderson's directive to debtors Preece and Stipes to sign their statements and schedules, even though they were incorrect, and his comments that he would correct them or finish them later.  Debtors sign these documents under penalty of perjury, attesting that they are true and correct to the best of their knowledge, information and belief.  *See* Fed. R. Bankr. P. 1008.  "The veracity of the statements filled out by the debtor is essential to the successful administration of the Bankruptcy Code."  *Job v. Calder (In re Calder)*, 93 B.R. 734, 738 (Bankr. D. Utah 1988), *aff'd*, 907 F.2d 953 (10th Cir. 1990).

In effect, Mr. Anderson instructed the debtors to commit perjury, to knowingly verify false documents.  As such, he "display[ed] a cavalier attitude toward the importance of a debtor's verification of crucial financial information needed by all interested parties in order to make the bankruptcy system function properly.  It is sanctionable conduct that certainly could justify the imposition of harsh penalties."  *In re Meyer*, No. 02-17587, slip op. at 8 (Bankr. E.D. Tenn. May 15, 2003) (court imposed sanctions on attorney that had client sign blank bankruptcy schedules and then filed the completed schedules without the client's review).

In light of Mr. Anderson's current inability to represent Ms. Kakas in a bankruptcy case, immediate return of the monies she paid him is in order.  Similarly appropriate is the disclosure of the names of all individuals from whom Mr. Anderson has received fees for the purpose of filing a bankruptcy case, but for whom a case has not been filed due to Mr. Anderson's suspension.  *See* R.P.C. 1.6(c)(2) ("A lawyer shall reveal information relating to the representation of a client to the extent the lawyer reasonably believes disclosure is necessary . . . to comply with an order or a tribunal requiring disclosure . . . .").

IV.

An order will be entered in accordance with this memorandum requiring Mr. Anderson to disgorge within thirty days all of the monies which he received from the debtors in the foregoing cases, less the monies he forwarded to Mr. Smith.  The order will also direct Mr. Anderson to promptly return to Shirley Kakas the $709 that she paid him for bankruptcy services which were never provided.  Finally, the order will direct Mr. Anderson to file a verified statement with the court setting forth the names of all individuals who have retained him or otherwise paid him fees for the purpose of providing bankruptcy services but for which a bankruptcy case has yet to be filed.

# # #

21